## GLOUCESTER WATER SUPPLY COMPANY *vs.* CITY OF GLOUCESTER.

Essex. December 6, 7, 1900. — June 19, 1901.

Present: HOLMES, C. J., KNOWLTON, MORTON, LATHROP, BARKER, HAMMOND, & LORING, JJ.

*Eminent Domain. Waterworks. Estoppel. Easement. Ancient Grant. Mill Privilege. Gloucester.*

When land is taken for a reservoir "to take and hold water," all water which gathers in the reservoir from springs or by percolation, not flowing in a stream, by necessary implication also is taken.

Cases holding that the owner of water rights may treat the actual diversion of the water by a municipality or corporation having a statutory right to take water as a legal taking of it, may rest upon the ground that the defendant is estopped to deny that there has been a legal taking, and are not decisive of the question,

whether a man can be deprived of his property by an act *in pais* purporting to be done under the right of eminent domain unaccompanied by a writing or other declaration defining the measure of interference with his ownership of the property. Per LORING, J.

A corporation created for the purpose of supplying a city with water was given the right to take water from ponds. The charter contained a provision, that the corporation within a certain time "after the taking of any land or water rights" should file in the registry of deeds "a description of any land so taken" and a further provision, that no application should be made for the assessment of water rights until the water was "actually taken and diverted" by the corporation. The corporation took and diverted the water of a certain pond for less than a year, supplying the city with water therefrom while its principal reservoirs were in process of construction and then abandoned the use of the water of the pond and never resumed it. No description of the water taken was filed in the registry of deeds. *Held,* that, without deciding whether the actual diversion of water would be a legal taking of it within the meaning of the statute authorizing the taking, such a temporary use of the water for less than a year, then abandoned and never resumed, was not a legal taking of the water within the meaning of the act as against a person who had rights in that water and who had not elected to treat it as a taking of it.

An easement created by grant is not lost by non-user.

St. 1881, c. 167, created a corporation for the purpose of supplying the city of Gloucester with water. Section 3 required the corporation, after the taking of any land or water rights under the provisions of the act "otherwise than by purchase" to file in the registry of deeds a description of the land so taken. *Held,* that the corporation had the power, recognized as above, to acquire land and water rights by purchase, as an incident to its business of securing and selling water, and that under this power it could purchase and hold a privilege of damming and flooding formerly used by a saw mill, although the running of a mill was beyond its charter powers.

In 1682 the town of Gloucester voted at a town meeting that "Jacob Davis and others joyninge along with him hath liberty of the streame at the head of the Little River to sett up a saw milne." *Held,* that by this grant, though without words of inheritance, a fee in the easement passed to the grantees. The rigid rules of construction applicable to modern conveyances are not to be applied to transactions of this kind, which took place soon after the settlement of the country when conveyancing was little understood. For the same reason the easement granted was not limited to damming the waters of the stream for the purpose of running a saw mill.

The ownership of a mill privilege, giving the right to dam a certain stream and flood a certain meadow, does not give the right to withdraw all the water that collects in the pond thus formed and sell it to the inhabitants of a city.

St. 1895, c. 451, § 16, provided for the purchase by the city of Gloucester from the Gloucester Water Supply Company of all the corporate property rights, privileges, easements, lands, waters, water rights, dams, reservoirs and appliances owned by that company and used in supplying the city with water. The water company had acquired by deed a mill privilege in a certain stream and a pond created by damming it. It had used the waters of the pond temporarily to supply the city with water while constructing its reservoirs, and had then discontinued the use. It did not own the land under the pond. The city objected to paying for the mill privilege on the grounds, that the waters of the pond were not in actual use when the property of the water company was transferred to

the city, that the mill privilege did not give the right to use the pond as a water supply and that the waters of the pond could not so be used without acquiring a fee in the bottom of the pond. *Held*, that the city had the right to acquire the fee in the bottom of the pond, that without acquiring the mill privilege the pond could not be used as a water supply, that the mill privilege was of value as a step towards the ownership of the pond as an auxiliary water supply, and that the mill privilege was the property of the water company owned and used by it within the meaning of the section above named.

St. 1895, c. 451, an act enabling the city of Gloucester to supply itself and its inhabitants with water, by § 16 made that right conditional on the city's purchasing the property of the Gloucester Water Supply Company, if that company should elect to sell its property to the city, and in that case provided, that "said city shall pay to said company the fair value thereof" and that "such value shall be estimated without enhancement on account of the future earning capacity, or future good will, or on account of the franchise of said company." Commissioners, appointed to value the property under the provisions of the act, excluded evidence of past earnings of the water company, and allowed the sum of $75,000 in addition to the cost of duplication of the plant less depreciation, in consideration of the fact that the plant was a going concern and in full operation at the time of the transfer. They allowed nothing for the powers of the water company which had never been exercised, to take additional sources of water supply, but considered the existence of such supplementary sources so far as they prevented impairment of the property on the ground that the company's sources shortly might be exhausted. The commissioners found "the fair value" of the property transferred by the company to the city September 24, 1895, "to be the sum of $600,500, with interest from September 24, 1895." They fixed the amount of costs, including their own fees, and apportioned them between the parties. *Held*, that the evidence of past earnings rightly was excluded. The franchise of the water company was not exclusive, but so long as it had no competitor it was practically in the enjoyment of an exclusive franchise, so that the earnings during this period were not proper evidence of the "fair value" of the property. *Held, also*, that the allowance above the cost of duplication, less depreciation because the corporation was sold as a going concern was justified, and that there was nothing in St. 1895, c. 451, forbidding it. Whether the provisions of the act, excluding future earning capacity and future good will, would allow present earning capacity and present good will to be taken into account or not, the element of value that came from the property being sold as a going concern was not excluded from consideration by the provisions of the act. *Held, also*, that the commissioners rightly allowed nothing for the unused powers of the water company to acquire additional sources of water supply. These rights could be revoked and were in fact revoked by St. 1895, c. 451. *Held, also*, that the commissioners properly could adopt, as a basis of their valuation, the value of the property at the date of its transfer to the city adding interest to the date of payment. *Held, also*, that any objection to the reasonableness of the fees charged by the commissioners must be made before a single justice.

PETITION to determine the value of the petitioner's water plant purchased by the respondent on September 24, 1895, under St. 1895, c. 451, § 16, filed October 29, 1895.

Commissioners were appointed under the provisions of the

act, who reported that the value of the plant, exclusive of any allowance for the franchise and rights other than the water rights of the company, and excluding all evidence as to the past earning capacity of the company, was $600,500, and that the petitioner should recover that amount with interest from September 24, 1895, less the sum of $3,955.40, which it was agreed should be deducted therefrom.

The case coming on to be heard before *Loring*, J., both parties moved that the report be recommitted to the commissioners with instructions. At the request of the parties, the justice reserved the case for the consideration of the full court upon the motions of the parties and the questions of the acceptance or recommittal of the award, it being agreed that any questions of law raised by either party and appearing in the award, or raised by the motion of either party to recommit the award, should be thus reserved.

The Gloucester Water Supply Company was incorporated under St. 1881, c. 167, for the purpose of furnishing pure water to the inhabitants of Gloucester. This statute authorized the corporation to take, hold and convey through the city the water of any springs, natural ponds, brooks or other water sources in Ward 8 of that city, and to take and hold, by purchase or otherwise, any real estate necessary for the preservation and purity of the same, or for forming any dams or reservoirs to hold the same, and for laying and maintaining aqueducts and pipes for distributing the water so taken and held; to lay pipes, and to do any other acts convenient and proper for carrying out the purposes of the act. It further provided, that the corporation should, within sixty days after the taking of any land or water rights otherwise than by purchase, file in the registry of deeds a description of the land so taken, with a statement of the purposes for which it was taken. The company was further authorized to establish and fix water rates, and to make contracts for the supply of water with the city or with individuals or corporations. Section 7 provided that the city should have the right to purchase the corporate property and the rights and privileges of the company.

The company was organized under this act, and in 1884 took certain tracts of land in Ward 8, which takings were duly re-

corded, made the necessary excavations, built dams and established reservoirs, and thereby took and held waters in Dikes and Wallace reservoirs, which constituted the sources of supply principally used by the company. Also, it bought in 1884 an ancient mill privilege near Freeman's swamp, so called, in Ward 8, which, as the petitioner alleged, entitled it to flow the meadows forming the bed of Lily Pond, and to have the water from Lily Pond run through Freeman's swamp from the dam at the pond to a small basin upon the mill site, and it actually took and used the waters of Lily Pond as a temporary water supply, while Dikes and Wallace reservoirs were in process of construction.

The ancient mill privilege, under which Lily Pond was created by damming Little River, was conveyed by Nathaniel Webster to the petitioner in 1884. It was originally derived from a grant made by the town of Gloucester, December 19, 1682, when at a town meeting it was voted that " Jacob Davis and others joyninge along with him hath liberty of the streame at the head of the Little River to sett up a saw milne."

From these various sources the company supplied the city and its inhabitants with water from 1885 until the transfer to the city on September 24, 1895, and since that time the city had used the same sources, except that Lily Pond water had not been drawn upon since 1886. After that year the petitioner did not use the waters of Lily Pond for any purpose whatever.

Section 3 of the petitioner's charter was as follows: " Said corporation shall, within sixty days after the taking of any land or water rights under the provisions of this act, otherwise than by purchase, file in the registry of deeds for the southern district of the county of Essex a description of any land so taken, sufficiently accurate for identification, with a statement of the purposes for which it is so taken, and the title of the land so taken shall vest in said corporation. Any person or corporation injured in property by any acts of said corporation, and failing to agree with said corporation as to the amount of damages, may have the same assessed and determined in the manner provided when land is taken for highways; but no application shall be made to the county commissioners for the assessment of damages for the taking of water rights until the water is actually taken and diverted by said corporation. Any person whose

water rights are thus taken or affected may apply as aforesaid within three years from the time the water is actually withdrawn or diverted, and not thereafter; and no suit for injury done under this act shall be brought after three years from the date of the alleged receipt of injury."

St. 1895, c. 451, authorized the city of Gloucester to supply itself and its inhabitants with water, but provided in § 16, that if, within thirty days after the act should be accepted by the city, the water company should notify the city that it desired to sell to the city "all the corporate property and all the rights, privileges, easements, lands, waters, water rights, dams, reservoirs, pipes, engines, boilers, machinery, fixtures, hydrants, tools and all appliances owned by said company, and used in supplying said city and the inhabitants thereof with water," the city should not proceed to establish its own plant unless it should first purchase of the company the property aforesaid.   The same section further provided that if the parties should be unable to agree upon the value of the property this court upon application of either party should appoint three commissioners to determine "the fair value of said property," and that such value should "be estimated without enhancement on account of future earning capacity, or future good will, or on account of the franchise of said company."

The commissioners in their report stated, that, except where the terms of the two acts differed, they had valued the property by the same methods that were employed in the case of *Newburyport Water Co.* v. *Newburyport*, 168 Mass. 541.

Those portions of the report of the commissioners which are necessary to an understanding of the points decided by the court are stated or described in the opinion.   The report concluded as follows:

"At the request of the respondent we have made the following findings, based upon its claim that we should not make certain allowances which we have included in the award hereinafter made, of $600,000, or $600,500, as the case may be:

"1. If the petitioner is not entitled to recover for the Dikes and Wallace reservoir property, including the water and water rights, lands and physical structure, the award hereinafter made is to be reduced $220,000, *i. e.*, $175,000 for the water and water

rights, and $45,000 for the physical structure and the lands connected therewith.

" 2. If it is entitled to recover for the Dikes and Wallace reservoirs, including the lands and all physical structures connected with the water rights, but not for the water, the award hereinafter made is to be reduced $175,000.

" 3. If Lily Pond water and water rights are not to be valued for domestic purposes, it is to be lessened $20,000; and if the city, upon the facts, is not required to pay anything for the water rights purporting to be conveyed to the petitioner under the Webster deed, on account of forfeiture under the mill grant, or for any reason, then an additional sum of $4,650 is to be deducted.

" 4. If not for the mill lot, including the pumping station, to be reduced by $11,500; excluding the station, by $250. [This point was waived by the defendant at the argument.]

" 5. If not for the second lot in the Webster deed, the reduction is to be $100.

" If it is held that the petitioner may recover for the water and water rights of Lily Pond, as herein set forth, but that it had, or the city has, no right to take the land in the pond owned by the railroad company outside of its location, the amount of this award hereinafter stated ought to be reconsidered so far as the valuation of Lily Pond water and water rights are concerned.

" It appeared that the city has been using the water plant, taking its water from the Dikes and Wallace reservoirs alone, since the date of the transfer.

" Upon consideration of the premises, we determined the fair value of the property transferred by the company to the city September 24, 1895, and which was owned by the company and used in supplying the city and the inhabitants thereof with water, as hereinbefore described, to be the sum of $600,500, with interest from September 24, 1895. But if the court shall determine that there had been no valid taking of the water and water rights, but despite this fact the same are to be valued and paid for, upon the principle already stated in this report, *i. e.*, that such defect, if any, can be cured for $500, then the said award should be $600,000, with interest from September 24, 1895. From the amount of the award, in any event, is to be deducted,

as of the time of the transfer, the sum of $3,955.40, being the amount agreed upon to be so deducted upon an accounting between the city and the company.

" This property is subject to an existing mortgage made to secure outstanding bonds to the amount of $250,000, bearing interest at five per cent per annum, payable January 1 and July 1, and maturing January 1, 1905. If, at the time of the payment of the award, any of these bonds remain outstanding, an amount sufficient shall be retained by the city to indemnify, and save itself harmless for the payment of these bonds when they mature.

" We award that the costs shall be $27,000, of which the petitioner shall pay $5,500, and the balance shall be paid by the respondent. Any amount allowed by the court, and paid by the county of Essex, on account of the costs or fees of the commissioners, shall be credited and paid to the respondent. The petitioner, having paid all the costs, may recover all but $5,500 from the respondent. Everett C. Bumpus, John R. Freeman, John W. Ellis, Commissioners."

The respondent contended, that the petitioner had no title to the water or water rights of Dikes and Wallace reservoirs, and no rights in Lily Pond as a source of water supply. The respondent further contended, that no allowance should be made for the fact that the plant was a going concern, and in full operation at the time of the transfer, and that the commissioners were not authorized to award interest on the amount of the valuation, or to fix their fees and determine how they should be apportioned between the parties.

The petitioner, on the other hand, contended that the commissioners were right in their rulings against the respondent upon the points above stated, and contended, that it was entitled also to compensation for its rights in the streets, its right to establish and collect water rates, and its rights to use various other sources of water supply in Ward 8, for which no compensation was allowed by the commissioners. The petitioner further contended that, in determining the value of the plant, the commissioners should have admitted the evidence of past earnings. The contentions of the parties are stated more fully in the opinion of the court.

The case was argued at the bar in December, 1900, and afterwards was submitted on briefs to all the justices.

*R. M. Morse,* (*F. L. Evans* with him,) for the petitioner.

*A. E. Pillsbury,* (*C. A. Russell* with him,) for the respondent.

LORING, J. 1. The respondent's first contention is that in estimating the value of the Dikes and Wallace reservoirs the water company is not entitled to include the value of any water or water rights.

These two reservoirs formed the water supply which was in use on September 24, 1895, when the petitioner's plant was transferred to the respondent city. The water which feeds these reservoirs was obtained by digging out two swamps and damming up their outlets. No brook flowed into either swamp in its natural state, but the water collected in the reservoirs "gathers" there, coming from the watersheds of the neighboring land; both swamps were taken in 1884 by the water company, and written descriptions of their bounds were filed in the registry of deeds under St. 1881, c. 167, § 3. In these descriptions it is stated, among other things, that "the above land, or real estate, has been taken . . . for forming and erecting dams, reservoirs, to take and hold water for the purposes above set forth, . . . and such other use and purpose as may be necessary and may be authorized by said act."

We are of opinion that this was a valid taking of the water which "gathers" in the reservoirs. Where land is taken for a reservoir "to take and hold water," all water which "gathers" in the reservoir from springs or by percolation, and none of which flows into the reservoir from a stream, is also impliedly taken. In such a case, the requirements of an adverse taking of such water under the right of eminent domain are complied with. See *Glover* v. *Boston,* 14 Gray, 282, 288; *Kenison* v. *Arlington,* 144 Mass. 456; *Hollingsworth & Vose Co.* v. *Foxborough Water Supply District,* 165 Mass. 186, 189; *Lexington Print Works* v. *Canton,* 167 Mass. 341, 344. Where a reservoir is fed by the waters of a brook which has been taken, in terms, by the water company, and is also fed by water which "gathers" in the reservoir, as water gathers in a well, it would be impracticable to hold that the only water to which the company had a title was the water of the brook, and that it had no title to the water

which gathered in the reservoir. Land cannot be used as a reservoir by a water company without the water company having a right to the water which "gathers" in the bottom of it by percolation or from springs.

We are therefore of opinion that in estimating the value of Dikes and Wallace reservoirs the water company is entitled to the value of the water which "gathers" there.

2. The objection originally taken by the respondent to the water company's title to the land on which the pumping station stands was waived at the argument.

3. As to the waters of Lily Pond: We are of opinion, on the one hand, that the water company had no right to use these waters for domestic purposes, and therefore that $20,000 must be deducted from the amount of the award; but, on the other hand, we are of opinion that the water company did own the right to flow Lily Pond and to use its waters for mill purposes, and therefore that the $4,650 allowed by the commissioners is not to be deducted from the amount of the award.

The only ground on which the water company claims the right to use these waters for domestic purposes is that for part of the year 1885–1886, while Dikes and Wallace reservoirs were being built, it used the waters of this pond in supplying the respondent city and its inhabitants with water. The water company contends that "the actual appropriation and diversion of the waters was sufficient to constitute a legal taking," and relies upon *Moore* v. *Boston*, 8 Cush. 274, *Bailey* v. *Woburn*, 126 Mass. 416, *Cowdrey* v. *Woburn*, 136 Mass. 409, and *Northborough* v. *County Commissioners*, 138 Mass. 263. In addition to these cases cited by the water company is the case of *Brickett* v. *Haverhill Aqueduct Co.* 142 Mass. 394. The respondent relies principally upon the decision in the case of *Warren* v. *Spencer Water Co.* 143 Mass. 9, and upon the case of *Hamor* v. *Bar Harbor Water Co.* 78 Maine, 127.

Whether the actual diversion of water is a legal taking of it, is a question on which the cases in this Commonwealth are not in entire harmony.

It seems to have been held in *Brickett* v. *Haverhill Aqueduct Co.* 142 Mass. 394, that the actual diversion of water was in that case a legal taking of it. It appears from the original

papers in that case that a permanent dam had been built across the outlet of the pond whose waters were alleged by the plaintiff to have been tortiously used to his, the plaintiff's, detriment, and a pumping station had been built in connection with it; and it was stated in the bill of exceptions " that the operations of the company as aforesaid were under the assumed authority of said chapter [St. 1867, c. 73], and were necessary for the purposes of said act." In that case, there was no pretence that the defendant had passed any vote stating that the waters of the pond in question, or any part of them, had been taken. The act in question (St. 1867, c. 73), gave the defendant aqueduct company authority to take the waters of the pond and to enter upon and dig up any land through which it might decide to lay its pipes; but it did not require any description, either of the land or of the water rights taken by it, to be filed in the registry of deeds or elsewhere. It appears from the brief of the defendant in that case that there are many acts in this Commonwealth drawn like the act there in question. See Sts. 1839, c. 114; 1845, c. 90; 1850, cc. 192, 198, 273; 1852, c. 210; 1856, c. 241; 1857, c. 135. These are all acts which, like St. 1867, c. 73, authorize the taking of water and land without stating in what the taking shall consist or requiring a description either of the land or of the water taken to be filed in the registry of deeds or elsewhere.

On the other hand, *Warren* v. *Spencer Water Co.* 143 Mass. 9, seems to be a decision the other way. The statute there in question (St. 1882, c. 119) authorized the water company to take the waters of any brook, and to take any real estate necessary for its use, and provided that the company should " cause to be recorded in the registry of deeds for the county of Worcester a description of any land so taken," but made no provision as to requiring, there or elsewhere, a description of the waters taken by the water company. The declaration in *Warren* v. *Spencer Water Co.* contained two counts, one for entering upon the plaintiff's land and laying pipes therein, and the second for deflecting the waters of a brook which had formerly flowed through her (the plaintiff's) pasture. The presiding judge ruled, with respect to the second count, that " the turning of the water of Shaw Pond by the defendant's servants into its pipes, in the absence of any other act or proceeding of the corporation in

relation thereto, was not such a taking of the water or of water rights under the statute as would preclude the plaintiff from maintaining an action of tort for the diversion of the waters from the brook running through her pasture "; and an exception to that ruling was overruled, although the question was not discussed in the opinion delivered by this court. And it is of some importance that there are many statutes like the statute in question in *Warren* v. *Spencer Water Co.*, which provide that the water company may take land and water, and then provide that if land is taken a description of it shall be filed in the registry of deeds, making no provision as to what must be done with respect to water taken by the water company under the act. Among such statutes are Sts. 1865, c. 132; 1866, c. 175; 1867, cc. 84, 272; 1868, c. 182; 1871, cc. 218, 307; 1872, c. 345; 1873, c. 242; 1874, c. 191; 1876, c. 42; 1880, cc. 127, 179, 203; and St. 1882, cc. 119, 142.

And finally, in *Moore* v. *Boston*, there is a statement that the legal taking is the actual use of the property taken, as is shown by the fact that it is a description of a previous taking that is to be filed in the registry of deeds. The act in question in *Moore* v. *Boston*, was not drawn like either of the two classes of acts already spoken of. That act (St. 1846, c. 167) authorized the respondent city to take water and land in order to supply its inhabitants with water, and provided: " The city of Boston shall, within sixty days from the time they shall take any lands, or ponds, or streams of water, for the purposes of this act, file, in the office of the registry of deeds, for the county where they are situate, a description of the lands, ponds, or streams of water so taken." A parcel of land belonging to the petitioner's estate was actually used by the respondent city for the purpose of building an aqueduct passing through it, during her lifetime, and a description of the land so taken was filed in the registry of deeds after her death. It was held that the petition for compensation was properly brought by the administrator, and on the ground that the exercise of the physical dominion over the property which it was contended had been taken was the legal taking of that property. There is a similar statement in *Northborough* v. *County Commissioners*, 138 Mass. 263, in which it was held that a petition for damages must be brought within one year after

water has been actually diverted, under a statute which provides that the petition shall be brought " within one year after the taking of such land, water source or water right, or other injury done as aforesaid, and not thereafter. No assessment for damage shall be made for the taking of any water right, or for any injury thereto, until the water is actually withdrawn or diverted." See St. 1882, c. 192, § 3. The conclusion reached in that case puts the statute there in question on the same footing as the act in the case at bar (St. 1881, c. 167, § 3), which is a common, if not a usual, form of limitation of such petitions. In the act in the case at bar, it is provided that the petition shall be brought " within three years from the time the water is actually withdrawn or diverted, and not thereafter."

*Bailey* v. *Woburn*, 126 Mass. 416, and *Cowdrey* v. *Woburn*, 136 Mass. 409, are cases where the owner of the land did not undertake to assert that his land had not been taken, but where he was seeking to obtain damages on the footing that it had been taken, and may well rest upon the ground that in such a case the water company or the respondent city is estopped to deny that there is no legal taking, even if there has been no legal taking. *Spaulding* v. *Arlington*, 126 Mass. 492, 494. *Lewis* v. *Boston*, 130 Mass. 339. *Moore* v. *Boston*, 8 Cush. 274, and *Northborough* v. *County Commissioners*, 138 Mass. 263, 266, are also cases where the owner of the land was seeking to obtain compensation on the footing that his property had been taken, and are not cases where he was asserting his right to his property as still his own, in spite of what had been done by the respondent city or company, and therefore are not cases which are decisive of the question whether a man can be deprived of his property by an act *in pais*, unaccompanied by a writing or other declaration defining the measure of interference with his ownership of the property which it is claimed has been taken under the exercise of the right of eminent domain. See *Glover* v. *Boston*, 14 Gray, 282, 288; *Kenison* v. *Arlington*, 144 Mass. 456; *Hollingsworth & Vose Co.* v. *Foxborough Water Supply District*, 165 Mass. 186, 189; and *Lexington Print Works* v. *Canton*, 167 Mass. 341, 344.

In connection with *Moore* v. *Boston* and *Northborough* v. *County Commissioners*, which was decided on the authority of *Moore* v. *Boston*, it is important to note that the case of *David-*

*son* v. *Boston & Maine Railroad*, 3 Cush. 91, on which the decision in *Moore* v. *Boston* was largely based, was subsequently explained to be a case resting on the doctrine of estoppel; that is to say, a case in which the respondent railroad company, having used the petitioner's land, was estopped to say that it had not taken his land, when the use it had made of it could only be justified by it if it had, in fact, taken his land. To that effect, see Shaw, C. J., in *Boston & Providence Railroad* v. *Midland Railroad*, 1 Gray, 340, 361. See also *Drury* v. *Midland Railroad*, 127 Mass. 571, 580. Moreover, it is well settled, in case a railroad constructs its roadbed on the land of the plaintiff, that the plaintff may, at his election, assert his title to his land and to the rails affixed to it by the railroad; *Meriam* v. *Brown*, 128 Mass. 391; or he may at his election bring a petition for compensation on the ground that the defendant is estopped to say that the land has not been taken. *Boston & Providence Railroad* v. *Midland Railroad*, 1 Gray, 340, 361. *Drury* v. *Midland Railroad*, 127 Mass. 571, 580. In the case of a railroad, the filing of the location is the act of taking. *Charlestown Branch Railroad* v. *County Commissioners*, 7 Met. 78. *Hazen* v. *Boston & Maine Railroad*, 2 Gray, 574, 580. *Chandler* v. *Jamaica Pond Aqueduct*, 114 Mass. 575, 577. Finally in *Saunders* v. *Lowell*, 131 Mass. 387, 388, *Moore* v. *Boston* is treated as a case resting on this doctrine of estoppel.

It is not necessary in this case to decide the abstract question which we have been discussing. However that question may be decided, we are of opinion that such an equivocal act as the temporary use of water for less than a year, which use is then abandoned and has never since then been resumed, is not a legal taking of that water under St. 1881, c. 167, § 2, as against a person who has rights in the water in question and who has not elected to treat it as a taking of it. The respondent city in objecting to the title of the water company to the waters of Lily Pond has a right to test its title by the question whether the rights of such a person have been extinguished.

For these reasons, we are of opinion that the $20,000 allowed as the value of the waters of Lily Pond for domestic purposes must be deducted from the amount of the award.

But we are of opinion that the $4,650 allowed for the value

of the right to use the waters of Lily Pond for a mill privilege must stand.

The respondent city contends that the mill privilege which was conveyed to the water company by the Webster deed had been previously extinguished by abandonment. It bases this claim on the fact that in 1873 the sawmill and the net and twine mill then at the mill pond were destroyed by fire, and that no use was made of the waters of Lily Pond after that, until they were temporarily used by the water company in supplying the respondent city and its inhabitants with water during a part of the year 1885 to 1886, while Dikes and Wallace reservoirs were being constructed. The respondent also contends that under its charter the water company could not acquire title to any land or water rights by purchase, and could not acquire a mill privilege at all; and finally, that under the terms of the original grant in 1682, a fee did not pass in the easement thereby created, but only a life estate. But we are of opinion that the mill privilege has not been extinguished by abandonment. The easement was created by grant, and in such a case it is not lost by nonuser. *Butterfield* v. *Reed*, 160 Mass. 361, 369. The cases of *French* v. *Braintree Manuf. Co.* 23 Pick. 216, *Fitch* v. *Stevens*, 4 Met. 426, *Hodges* v. *Hodges*, 5 Met. 205, were cases involving a right to maintain a dam under the mill acts, and rest on other principles. The right of the water company to acquire land or water rights by purchase is plain; it is recognized in the third section of its charter. And we are of opinion that, as an incident to its business of securing and selling water, it could purchase and hold this privilege of damming the waters and flooding the Lily Pond meadow, although the running of a mill was beyond its charter powers. *Brown* v. *Winnisimmet Co.* 11 Allen, 326. And further, that although no words of inheritance were used in the original grant by the town of Gloucester to " Jacob Davis and others joyninge along with him" made in 1682, a fee in the easement passed to the grantees. It is well settled that the rigid rules of construction which are applicable to modern conveyances are not to be applied to transactions of the kind in question, which took place early after the settlement of the country, when conveyancing was little understood. *Adams* v. *Frothingham*, 3 Mass. 352. *Stoughton* v. *Baker*, 4 Mass. 522.

*Ipswich Grammar School* v. *Andrews,* 8 Met. 584, 592. *Green* v. *Putnam,* 8 Cush. 21, 25. For the same reason, the easement granted was not limited to damming the waters of the stream for the purpose of running a sawmill. *Adams* v. *Frothingham,* 3 Mass. 352. On the other hand, the ownership of the mill privilege did not give the water company the right to withdraw all the water that collects in Lily Pond and sell it to the respondent city and its inhabitants, and for that reason, the $20,000 allowed by the commissioners must be deducted as we have already stated.

The respondent further contends that the $4,650 allowed by the commissioners must be deducted from the award, because the waters of Lily Pond were not in actual use when the property of the water company was transferred to the city, because the title to use the waters of Lily Pond as a part of the mill privilege in the waters of Little River does not confer a perfect title to the waters of Lily Pond upon the city, and finally, because the waters of that pond cannot be made fit for the purposes of a domestic water supply without acquiring the fee in the bottom of the pond. But it is plain that the city has the power to acquire the fee in the bottom of the pond, and it is also plain that the waters of Lily Pond had been used in furnishing the respondent city and its inhabitants with water in 1885 and 1886, and that without the ownership of the mill privilege in Little River these waters could not have been so used. The mill privilege is of value as a step toward the ownership of the waters of Lily Pond as an auxiliary supply, and those waters having once been used by the water company in supplying the respondent city and its inhabitants with water, the mill privilege is the property of the water company, owned and used within St. 1895, c. 451, § 16.

4. It will be convenient to consider the respondent's contention that the commissioners had no right to award the $75,000 allowed by them in addition to the cost of duplication of the water company's plant, less depreciation, in connection with the water company's contention that evidence of past earnings of the water company should have been admitted in evidence.

The act under which the award was made (St. 1895, c. 451) is an act enabling the city of Gloucester to " supply itself and

its inhabitants with water." By § 16 of that act, that right is made conditional on its, the city's, purchasing the property of the water company in case the water company elects to sell its property to the city. In case the city agrees to buy the water company's property, under an offer of the water company made under the provisions of that section, it is provided that "said city shall pay to said company the fair value thereof. . . . Such value shall be estimated without enhancement on account of future earning capacity, or future good will, or on account of the franchise of said company."

In determining the true construction of these provisions of § 16, it is important to bear in mind the purpose, which the Legislature had, in making the right of the city to supply itself with water conditional on its buying the company's property, in case the company elected to sell it to the city, and in providing that in ascertaining the "fair value" of that property, it should not be enhanced "on account of future earning capacity, or future good will, or on account of the franchise of said company."

On the one hand, it is plain that a private water company organized for net profits cannot hope to compete with a city, which can rely upon taxes to supply a deficit in operating expenses. For that reason, it is also plain that if the Legislature had not required the city to buy the water company's property, the company's property would have been practically, though not legally, confiscated. No doubt, therefore, can arise as to the reasons for the insertion of the clause in § 16 providing that the value shall not be enhanced "on account of the franchise of said company." The franchise of the Gloucester Water Supply Company was not an exclusive franchise. The grant of a similar franchise to the city of Gloucester to supply itself and its inhabitants with water was not a violation of the franchise rights of the Gloucester Water Supply Company; and finally, the sale to the city was not obligatory on the water company. The company was given the option of selling its property to the city or of going on in competition with the city, under the act in question. Under these circumstances, it is plain that the value of the company's property, which the city is compelled to buy, ought not to be enhanced "on account of the franchise of said company."

It is also plain, so long as a water company has no competitor in supplying a town or city with water, it is practically in the enjoyment of an exclusive franchise, although its franchise is not legally an exclusive one. For that reason, the past earnings of this company were not evidence of the "fair value" of this property. The earnings of a company which is in the enjoyment of what is practically an exclusive franchise are not a criterion of the "fair value" of the property apart from an exclusive franchise. We are of opinion that the evidence of past earnings offered by the water company was properly excluded. *Newburyport Water Co.* v. *Newburyport*, 168 Mass. 541.

It is argued by the petitioner that the admissibility of such evidence derives support from St. 1891, c. 370, § 12, which provides that in determining the "fair market value" of a gas or electric plant under similar circumstances "the earning capacity of such plant based upon the actual earnings being derived from such use at the time of the final vote of such city or town to establish a plant" is to be included "as an element of value"; but this clause as to the earning capacity being considered as an element of value was omitted from the act in question.

The only doubt as to the propriety of the allowance of a sum in addition to the cost of duplication, less depreciation, of the water company's plant is whether the principles on which the commissioners proceeded were sufficiently favorable to the water company.

It is plain that the real, commercial, market value of the property of the water company is, or may be, in fact, greater than "the cost of duplication, less depreciation, of the different features of the physical plant." Take, for example, a manufacturing plant: Suppose a manufacturing plant has been established for some ten years and is doing a good business and is sold as a going concern; it will sell for more on the market than a similar plant reproduced physically would sell for immediately on its completion, before it had acquired any business. *National Waterworks Co.* v. *Kansas City*, 62 Fed. Rep. 853.

We think it is plain that there is nothing in the provisions of § 16 of the act in question, St. 1895, c. 451, forbidding the commissioners considering this element of value which, as we have seen, in fact exists. The provisions of the act are that the

" fair value . . . shall be estimated without enhancement on account of future earning capacity, or future good will, or on account of the franchise of said company." Whether that would allow present earning capacity and present good will, apart from the franchise, to be taken into account, as distinguished from future earning capacity and future good will, need not be considered. It is plain that the element of value, which comes from the fact that the property is sold as a going concern, in which case it has, or may have, in fact, a greater market value than the same property reproduced in its physical features, is not excluded from consideration by that provision of the statute.

It is also plain that the commissioners, in allowing the $75,000 allowed by them in addition to the cost of duplication, less depreciation, of the plant in its physical features, did not go beyond this. They state that in their opinion " the cost of duplication, less depreciation, of the different features of the physical plant, . . . does not represent a fair valuation of this plant, welded together, not only fit and prepared to do business, but having brought that business into such a condition that there is an enhanced value created thereby, so that the city in purchasing it, without considering its income or right to do business, but having the power to carry it on on its own account, should pay more for the property as such than as if this consideration did not obtain. This is a value that we have found to be seventy-five thousand dollars ($75,000) that has been imported into the plant, which seems to us as much a part of the property valuation as any other part of it."

5. We are of opinion that the commissioners could properly adopt, as a basis of their valuation, the value of the property at the date of its transfer to the city, adding interest to the date of payment.

6. The objection made by the respondent to the reasonableness of the fees charged by the commissioners must be raised before a single justice of this court.

7. The right to have the report recommitted because the company had a right to take additional sources of water supply in Ward 8, to lay and maintain pipes in the streets, and to charge water rates, was not raised in the commissioners' report, nor is it mentioned in the motion to recommit that report, and

therefore it is not open, under the terms of the report reserving the case for this court; but we think that the water company got all the advantage to which it was entitled by its authority to take additional sources of water supply. The commissioners found that " the failure to take and create property by the exercise of its franchise rights gives nothing that we can appraise under the statute. We, however, permitted the petitioner's experts to take into consideration the effect upon the value, if any, of the water rights owned by the company by the presence of these additional supplies. We did not, after considering the amount of the available water supply of the company in 1895, enhance the value of its supply on account of the presence of the supplementary sources, but the fact that they could be so employed prevented any impairment under any claim that the company's sources would be shortly exhausted, and therefore likely to be abandoned."

Apart from these considerations, we think the commissioners were correct in not considering these rights of the water company. These rights could be revoked, and were revoked by St. 1895, c. 451.

The following sums are to be deducted from the total award made by the commissioners: (1) $20,000 for water rights in Lily Pond; (2) $3,955.40, an amount agreed upon between the parties. The report of the commissioners should be affirmed as a report for $576,544.60, with interest from September 24, 1895; but the case is to stand for hearing on the amount to which the petitioner is entitled by its payment of the costs charged by the commissioners.

*So ordered.*