# DECISIONS

OF THE

# SUPREME JUDICIAL COURT

OF

# MASSACHUSETTS

---

COMMONWEALTH *vs.* MASSACHUSETTS TURNPIKE AUTHORITY
(and a companion case).

Suffolk.    February 2, 1965. — April 6, 1965.

Present: WILKINS, C.J., SPALDING, CUTTER, SPIEGEL, & REARDON, JJ.

*Massachusetts Turnpike Authority. Eminent Domain,* Land of the Commonwealth, Massachusetts Turnpike Authority, Validity of taking, Taking of public property, Damages. *Commonwealth,* Real property.

A taking by eminent domain by the Massachusetts Turnpike Authority of a State armory in Boston for the purpose of extending the turnpike pursuant to St. 1952, c. 354, § 1, as amended by St. 1955, c. 47, even if originally unauthorized and invalid, was ratified by the Legislature by St. 1962, c. 717, § 1, and was valid.    [4]

The Massachusetts Turnpike Authority was obligated to pay compensation in accordance with G. L. c. 79 to the Commonwealth for a taking by eminent domain for the turnpike of real estate held by the Commonwealth in its public, governmental capacity; St. 1955, c. 693, § 1, as amended by St. 1957, c. 657, was inapplicable.    [9]

BILL IN EQUITY filed in the Supreme Judicial Court for the county of Suffolk on September 25, 1963.

The case was reserved and reported without decision by *Cutter, J.*

PETITION filed in the Superior Court on October 16, 1963.

Denial of a motion to dismiss was reported by *Macaulay, J.*

*John L. Murphy, Jr. (John L. Murphy & Arthur A. Karp* with him) for the Massachusetts Turnpike Authority.

*John F. St. Cyr,* Legal Assistant to the Attorney General, *& Charles Ingram,* Special Assistant Attorney General, for the Commonwealth.

CUTTER, J.   These cases arise out of the Authority's purported taking by eminent domain (in connection with the Boston extension of the Massachusetts turnpike) of the premises (the locus) formerly occupied by the Commonwealth's Irvington Street armory in Boston.   The first case is a bill in equity filed by the Commonwealth in the county court on September 25, 1963, to have the Authority's purported taking (made on May 29, 1962) declared void, and for other relief.   The second is the Commonwealth's petition under G. L. c. 79 (filed in the Superior Court on October 16, 1963) for the assessment of damages for the taking.

On October 16, 1963, upon completion of the original pleadings in the equity suit, it appeared that the armory had been demolished in 1962 and that the Authority was doing construction work on the locus.   In such circumstances, injunctive relief was plainly inappropriate.   Accordingly, the single justice stayed the equity proceedings until further order of the court, thus affording the Commonwealth opportunity to seek compensation by any suitable procedure.   The Commonwealth thereupon at once filed its petition in the Superior Court for the assessment of damages.

On December 18, 1963, damages of $895,000[1] were assessed by a jury.   The time for the allowance of a bill of exceptions has been extended and, so far as this record shows, no bill of exceptions has been allowed, although a motion for a new trial was denied on March 5, 1964.

Shortly after the decision in *Massachusetts Turnpike Authy.* v. *Commonwealth,* 347 Mass. 524, the Authority filed on June 12, 1964, a motion to dismiss the Common-

[1] The Authority, at the time of the purported taking, awarded only obviously inadequate damages of one dollar, a practice which disregards the plain intention of G. L. c. 79, § 6 (see now St. 1964, c. 579, § 2).   See *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Authy.* 335 Mass. 189, 190, fn. 2.   It was not until after the denial of a new trial in the Superior Court that the Authority on March 17, 1964, made a pro tanto payment to the Commonwealth of $232,500 on account of the purported taking, although the payment had been agreed upon as early as November 13, 1963.

wealth's petition under c. 79 on the ground that c. 79 does "not apply to public land which is taken for highway purposes." This motion was denied on August 28, 1964, by a judge of the Superior Court (not the judge who had presided at the jury trial). He filed a report of material facts and ruled that the Commonwealth's petition under c. 79 could be maintained. He then reported the case to this court.

On November 23, 1964, a single justice of this court reserved and reported to the full court the equity case (then still pending in the county court) upon amended pleadings and a statement of agreed facts. This statement incorporated by reference the report of material facts made by the Superior Court judge in respect of the petition under c. 79.

The Commonwealth had owned the fee in the locus since December, 1888. The armory was built in 1899, and was used as an armory until May 29, 1962, when the Authority made the purported taking. On August 20, 1962, the Armory Commission delivered to the Authority the keys to the armory and vacated the locus. The commission and the Authority have failed to agree upon the damages to be paid for the purported taking.

The principal issues in each case are (1) whether the Authority's purported taking of the armory was valid, and (2) if it was valid, whether the Authority must pay damages to the Commonwealth.

1. In *Commonwealth* v. *Massachusetts Turnpike Authority,* 346 Mass. 250 (hereafter called the Charles River decision), we considered whether the Authority had power to take certain land in and near the Charles River. That land, unique in various respects, was then being used by the Metropolitan District Commission for flood control work, among other purposes. This court affirmed an order overruling the Authority's demurrer to the Commonwealth's bill (brought in behalf of the commission) to enjoin as illegal a purported taking of these lands. We stated (346 Mass. 250, 254–255) that St. 1952, c. 354, § 5 (k), giving the Authority power to acquire "by . . . eminent domain . . .

such public lands . . . as it may deem necessary'' for build-
ing the turnpike did not definitely authorize the acquisition
of the Charles River lands then used for other public pur-
poses.   In the opinion (p. 254) *Appleton* v. *Massachusetts
Parking Authy.* 340 Mass. 303, was discussed, and it was
pointed out that the taking in the *Appleton* case dealt with
a small area specifically described in the statute author-
izing the taking (see 340 Mass. 303, 310), whereas, in the
Charles River decision, taking of the public land in dispute
was not specifically authorized.   In the present case, there
was no specific statutory authorization of the taking of the
locus in the legislation relating to the Boston extension of
the turnpike.   See St. 1955, c. 47.   Certainly, by now, it is
well settled by the cases just cited that language such as
that in St. 1952, c. 354, § 5 (k), does not constitute ''a rov-
ing eminent domain provision which . . . [may] be used to
take . . . unspecified'' public lands, at least of the Com-
monwealth, devoted to other important public uses.

We need not determine, however, whether (despite G. L.
[Ter. Ed.] c. 79, § 5, and what was said in the Charles
River decision) § 5 (k) authorized the original taking of
the locus.   If the taking was not authorized and was in-
valid (with the consequence that the Authority became li-
able for trespass) the Legislature now has specifically rati-
fied the Authority's action in making this very taking.   See
St. 1962, c. 717, § 1.[2]   This 1962 statute by necessary impli-
cation constitutes consent to this taking, as in fact made,
without considering whether it was originally valid.   It
also clearly expresses the legislative understanding that
compensation was to be paid to the Commonwealth for the
armory.   We hold that the taking was valid.

---

[2] Section 1 of St. 1962, c. 717 (''An Act providing for the disposition of
certain funds paid by the . . . [A]uthority upon the taking by eminent do-
main of the [S]tate armory on Irvington Street in . . . Boston''), reads,
''Funds paid by the . . . Authority for the taking by eminent domain of the
state armory, located at Irvington Street in . . . Boston . . . shall be paid
into the state treasury and may be expended by the armory commission for
the acquisition of sites and the erection and equipping of armory facilities to
replace said armory, . . . to be in addition to the amount appropriated in
item 8262–01 of'' St. 1961, c. 544, § 2.

2. The Authority contends that, if the taking was valid, it is not required to pay the Commonwealth any compensation. It is well settled, of course, that "[l]and owned . . . by a municipality in its public [or governmental] capacity [as opposed to its private or proprietary capacity, or as a fiduciary] may be taken and transferred by the Legislature to another public use or agency without the payment of compensation." See *Worcester* v. *Commonwealth,* 345 Mass. 99, 100. The armory obviously was held by the Commonwealth in its public, governmental capacity. Thus the Commonwealth's right to compensation depends upon the relevant legislation.

As Chief Justice Shaw said (in a case discussing the taking by a railroad of land held by the Commonwealth for public purposes), "[T]he question is purely a question of intention, to be derived from the act of the [C]ommonwealth, as applied to the subject matter, and expounded in conformity with the established rules of construction. It is very clear, that the [C]ommonwealth, by an act of legislation, in express terms, may grant its lands, or any qualified interest or easement in land. It is equally clear, that the [C]ommonwealth may grant a franchise, including a power to lay out a way over its lands, upon such terms as the [L]egislature may prescribe, among which may be a condition, that the grantees shall pay a reasonable compensation for any land of the [C]ommonwealth which may be taken . . . ." See *Commonwealth* v. *Boston & Maine R.R.* 3 Cush. 25, 43. That case held that, under the statute then being considered, "it was not the intention of the [L]egislature to grant the land of the [C]ommonwealth . . . without compensation." In reaching this conclusion, weight was given (p. 46) to the circumstance that the "whole . . . scheme of the enterprise is, that the entire outlay and all the disbursements, including the value of land necessarily taken, shall be advanced in the first instance by the . . . [railroad]; and the tolls, fares, and freights to be levied . . . are to be so adjusted, that the aggregate shall pay all expenses and afford a fair income to the proprietors upon

their entire investment. It is to make the travel accommodated pay the whole expense of the accommodation. Why, then, although the use is a public one, shall it be presumed, that the [C]ommonwealth intended to give land, in a particular case, any more than it shall be presumed, that they intended to give money from the treasury?"

The circumstances considered in the *Boston & Maine* case are not precisely parallel to those now before us, for there a privately owned railroad was involved, whereas here a public authority made the taking. Nevertheless, the great similarities between the cases make the principles of the *Boston & Maine* decision controlling. See *Commonwealth v. Boston Terminal Co.* 185 Mass. 281, 287–288; Nichols, Eminent Domain (3d ed.) § 2.23, at p. 283, where it is said, "A state may expressly authorize the taking of its property by a private corporation and may even provide, when the acquisition is for a public use, that there need be no compensation for such taking. Such provision must, however, be affirmatively asserted in the authorizing legislation. Authority to take the state's property without any provision as to compensation implies a duty to make payment therefor."

The statute creating the Authority is St. 1952, c. 354, as amended. In the aggregate, the statutory provisions mentioned in the margin[3] show a legislative intention (a) that the turnpike shall be financed by borrowed capital to be repaid from tolls and other revenues from users of the turn-

---

[3] The following provisions of St. 1952, c. 354, as amended, seem of special significance. The Authority is a separate entity (§ 3). It is to issue revenue bonds (§§ 5 [g], 8) "payable solely from the tolls and revenues pledged for their payment." See § 5 (g). These bonds are not a debt of the Commonwealth and its credit is not pledged. See § 2. The Authority may fix and collect tolls (§§ 5 [h] and 10) which are to be used for the retirement of bonds. When the bonds have been paid, or their payment has been provided for, the Commonwealth is to receive the turnpike as part of the State highway system. See § 17. An appropriation of $500,000 from the State highway fund for preliminary expenses was to be repaid to the Commonwealth from bond proceeds. See § 18. By § 7, the cost of any reconstruction of a highway, and of any resulting damage, is made "a part of the cost of the turnpike." See also the Charles River decision (346 Mass. 250, 253), where the 1952 statute, referring to the consent of the Commonwealth "to the use of all lands owned by it," was construed as not embracing a power to take by eminent domain. We also find in § 7 no waiver of any claim to compensation.

pike, (b) that the Commonwealth shall obtain the turnpike after it is paid for, and (c) that no part of the project's cost shall be directly borne by the Commonwealth. Indeed, it would be strange if the Legislature intended to impose upon the Commonwealth the potentially great cost of replacing possibly a considerable number of valuable facilities like the armory (which the jury have found to have been worth nearly $900,000) when it was inserting (see fn. 3) in § 18 a requirement that a preliminary appropriation of $500,000 be repaid by the Authority. Statute 1952, c. 354, falls far short of asserting affirmatively that the Commonwealth is not to be compensated when its property is taken by the Authority.[4]

The Authority relies greatly upon St. 1955, c. 693, § 1 (as amended by St. 1957, c. 657),[5] as relieving it from the necessity of paying compensation for the taking. These statutes were considered in *Massachusetts Turnpike Authy.* v. *Commonwealth,* 347 Mass. 524 (hereinafter called the Newton-Weston decision). It will be noted (fn. 5) that, from the opening clause (beginning with the word "Notwithstanding") of St. 1955, c. 693, § 1, the provisions of St. 1952, c. 354, are expressly excepted.

---

[4] Because St. 1962, c. 717 (fn. 2), was passed on July 23, 1962, nearly two months after the taking, we do not rely upon it. We thus need not determine whether, in the circumstances, the Legislature could retroactively require the payment of compensation for taking the locus. Nevertheless, c. 717 may be of some significance as showing the 1962 Legislature's understanding that compensation was in fact required by the earlier statutory provisions.

[5] Statute 1955, c. 693, § 1, reads, in part, "Notwithstanding any provisions of law, *except the provisions of*" St. 1952, c. 354, as amended, "authorizing the taking by eminent domain . . . of certain public lands for highway improvements without the payment of damages therefor, the state department of public works or such other . . . authority . . . as may be involved is hereby authorized and directed to pay to the . . . department . . . or agency in possession of lands so taken . . . an amount to be mutually agreed upon" (emphasis supplied). Statute 1957, c. 657, added to c. 693, § 1, two paragraphs, of which the first is here relevant, "In the event that the parties . . . are unable to . . . agree upon the amounts to be paid . . . the matter shall be referred to the real estate review board created by" St. 1954, c. 403, § 6, "which shall determine the amount to be paid, and said determination shall be final." The legislative history of c. 693 is not informative on matters here in issue. See 1955 House Bill No. 3002. The original papers show that the italicized words in c. 693, § 1, were inserted upon recommendation of the House Committee on Ways and Means on July 28, 1955. See 1955 House Journal, p. 2014.

In the Newton-Weston decision this court upheld the dismissal of the Authority's petition (under G. L. c. 79) for damages because of the Commonwealth's taking for highway purposes of certain land of the Authority in Newton and Weston. After commenting that the "draftsmanship [of c. 693, § 1] is faulty," this court concluded (pp. 528–529) that the exception (italicized in fn. 5) in c. 693, § 1, of the provisions of St. 1952, c. 354, as amended, had the effect of making "an exception of the Authority only with respect to the *taking by it* of public lands, and not with respect to a case . . . where land is *taken from* the Authority. This means that when public land is taken for highway improvements in circumstances where formerly no damages were paid, namely where the land was held in a governmental rather than in a proprietary capacity, St. 1955, c. 693, and now also St. 1957, c. 657, apply, and damages will be paid under those statutes except where the [a]uthority makes the taking, in which case the previous law will continue to govern and no damages will be payable. But where the land taken is held in a proprietary capacity, St. 1955, c. 693, and St. 1957, c. 657, are inapplicable, and the 'city, town, department, authority or agency in possession' may proceed under G. L. c. 79, as amended."

The Authority lays emphasis upon the words "in which case the previous law will continue to govern and no damages will be payable," and argues that this language supports the view that it is not bound to pay compensation to the Commonwealth. The original papers in the Newton-Weston case, however, show that this court then had before it no question concerning whether compensation would be payable by the Authority in the event of a taking by it of land owned by the Commonwealth in its governmental capacity. Indeed the Commonwealth in its brief (p. 9) there conceded that the Authority might "*take* certain public lands without paying damages therefor." In the light of the analysis of St. 1952, c. 354, made above (see fn. 3), this concession was improvident. The law existing prior to the enactment of St. 1955, c. 693, required the Authority to pay

compensation if it took public lands of the Commonwealth. Accordingly, the Newton-Weston decision does not help the Authority, which must pay just compensation for taking the locus. This is to be determined in accordance with G. L. c. 79, and not in accordance with St. 1955, c. 693, § 1, as amended (fn. 5).

3. In the equity case, a final decree is to be entered in the county court dismissing the Commonwealth's bill. The order denying the Authority's motion to dismiss the Commonwealth's petition under G. L. c. 79 is affirmed.

*So ordered.*