COMMONWEALTH *vs.* MASSACHUSETTS TURNPIKE AUTHORITY.

Suffolk.    December 9, 1966. — March 3, 1967.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Damages,* Eminent domain. *Value: Eminent Domain,* Damages. *Evidence,* Of value; Opinion: expert.

In a proceeding for assessment of damages for a taking by eminent domain of an armory of the Commonwealth constituting a special purpose property, evidence of adjusted reproduction cost of the building was irrelevant and improperly admitted where the building, constructed over seventy years before the taking, was obsolete and would not have been reproduced. [149]

Although an old armory building of the Commonwealth was obsolete and would not have been reproduced, evidence that it could have been used for a substantial period of years after it was taken by eminent domain entitled the Commonwealth, in a proceeding for assessment of damages for the taking, to show the building's residual useful value to it and to be awarded damages for loss of that value, which might be determined by reasonable computations and by the aid of expert testimony [149–150]; KIRK, J., concurring in sustaining exceptions.

PETITION for assessment of damages filed in the Superior Court on October 16, 1963.

The case was tried before *Barron, J.*

*John L. Murphy, Jr.* (*Arthur A. Karp* with him) for the Massachusetts Turnpike Authority.

*Charles Ingram,* Special Assistant Attorney General (*Nicholas G. Curuby* with him), for the Commonwealth.

CUTTER, J.    The Commonwealth seeks under G. L. c. 79 the assessment of damages caused by the Authority's eminent domain taking of premises formerly occupied by the Irvington Street armory in Boston. In *Commonwealth v. Massachusetts Turnpike Authy.* 349 Mass. 1, decided April 6, 1965, we held that the Authority was bound to pay damages to the Commonwealth for taking the locus, thus placing the burden of its acquisition for road purposes upon the portion of the public using the toll turnpike rather than upon the general body of taxpayers.

A jury awarded the Commonwealth $895,000 by a verdict returned on December 18, 1963. A bill of exceptions was not allowed until May 2, 1966. The evidence would warrant finding the facts summarized below.

This land area of 62,356 square feet, covered almost entirely by the armory, was taken on May 29, 1962. The armory was an "old castle-fortress type" brick building, with granite trim, built in 1889 or 1890 for the use of twelve to fifteen units of militia. Part of the structure was three stories in height. Part of it was a large drill hall, 298 feet long and 130 feet wide. The building was in 1962 "the oldest armory in use in" Massachusetts.

Four units, with a combined strength of 314 men, were using the armory in 1962. There were also nonmilitary uses.[1] The locus had no motor vehicle parking facilities. There was need to replace the armory. If and when replaced, a modern type of armory and not an old fashioned castle type of building would be built. "[A]rmory requirements vary from time to time" with changes in military practices and methods of training. In recent years new armories have been similar to school buildings with gymnasiums. It could reasonably have been concluded that the use of the armory might have continued for from five to fifteen years after the taking and that, if not destroyed, it would have been in use in 1963 at the time of the trial.

Armories "are not commonly bought and sold." One witness, however, had participated in the sale of a smaller old fortress type armory in Cambridge to Massachusetts Institute of Technology (M.I.T.) which could have been found to have been made in an effort to coöperate in expanding M.I.T.'s accommodations for students and research. Another old armory was given to the city of Brockton for school purposes when a new armory was built. An armory in Boston on East Newton Street was transferred to the State Department of Mental Health in 1963.

---

[1] Various bands and drum corps used the building. The city of Boston also used it for physical education and for track, basketball, and baseball events, voting during elections, and exhibition hall purposes.

The Dartmouth Street portion of the Irvington Street armory had not been used since 1956 or 1957. Prior to the taking the Armory Commission had made no decision to discontinue use of the building.

Subject to the Authority's exception, an expert engineer testified that the 1962 cost of reproducing the armory as new, apart from land, was $2,431,196, and that the amount of physical depreciation (exclusive of obsolescence) was $1,107,064. In his opinion the armory was a special purpose building because of its armory design, its massiveness, and the great size of the drill shed.[2] A qualified real estate appraiser testified that, after allowing for obsolescence, the depreciated reproduction cost of the building was $1,000,000. He valued the land at $200,000. This witness was of opinion that "the highest and best use of the property was the use at the time of the taking." Two expert witnesses called by the Authority based their opinions in large measure upon what they thought a buyer might pay for the building.[3]

---

[2] One of the expert appraisers called by the Authority in his report described the armory as "a service type property as opposed to an investment type property. Service type properties include those properties whose true value derives from use and occupancy, usually public. Properties of this nature comprise churches, hospitals, museums, government buildings . . . and so forth."

[3] The widely varying opinions of the principal expert witnesses may be summarized: —

| Real Estate Appraiser No. 1 | | Real Estate Appraiser No. 2 | | Real Estate Appraiser No. 3 | |
|---|---|---|---|---|---|
| (Called by the Commonwealth) | | (Called by the Authority) | | | |
| *Building* | | *Building* | $100,000 | *Building* | $115,000 |
| Reproduction cost | $2,431,196 | | | | |
| Physical depreciation | 1,107,064 | | | | |
| | $1,324,132 | | | | |
| Depreciated reproduction cost (including obsolescence - economic and functional) | $1,000,000 | | | | |
| *Land* | | *Land* | | *Land* | |
| Area 62,356 at $3.20 per sq. ft. | 200,000 | At $2 per sq. ft. | 125,000 | | 125,000 |
| Total value | $1,200,000 | | $225,000 | | $240,000 |

There was also evidence concerning the nature and cost of the type of modern armory likely to be built to house the units using the Irvington Street armory if that armory should be replaced.[4]

We have before us the Authority's exceptions (a) to the admission of evidence of the adjusted reproduction cost of the armory structure, (b) to the exclusion of testimony sought from expert witnesses, and (c) to the trial judge's refusal to give requested instructions.

1. The taking involved premises used mainly for special public or quasi-public purposes and incidentally for other collateral or subsidiary special activities. The problem of proving the extent of the damage was particularly difficult because, over the years, changes in military practices had made the armory less and less well adapted for its principal use. It was, however, still usable and useful in the absence of more modern facilities.

The evidence, including photographs of the locus as it was at the time of the taking, tends to support the Commonwealth's view that the armory was a "special use" or service-type property (see fn. 2). Although the building could be used incidentally for public events, athletic contests, and certain trade and social affairs, the jury could reasonably conclude that it was not primarily designed for these purposes; that such a building would not be offered for sale or have any general market; that the most valuable use of the structure was as an armory; and that its value for incidental activity was less than its residual value to the Commonwealth during the armory's remaining useful life as public property to be employed as an armory and for related public purposes.

---

[4] The Irvington Street armory had about 131,600 square feet of floor space. Current construction criteria would call for 32,005 to 36,880 square feet (estimated to cost $425,000, excluding site preparation and acquisition expense, for the smaller area, and $489,000 for the larger area) for administrative, storage, and training space for those units using the armory in 1962. If missile battalions were to revert to armory status, the armory on the locus "would be the only place to bring them back to." There was thus possible need for more than 32,005 to 36,880 square feet. For five armories, built between 1960 and 1963, the cost per square foot was $13.26. Presumably, if more space should be desired, the total replacement cost would be higher.

In eminent domain cases the general measure of damages is the fair market value of the property at the time of the taking. *Tigar* v. *Mystic River Bridge Authy.* 329 Mass. 514, 517. This measure necessarily "is always based upon hypothetical conditions" (see Nichols, Eminent Domain [Rev. 3d ed.] § 12.32, p. 218) in that it is supposed to be "the highest price which a hypothetical willing buyer would pay to a hypothetical willing seller in an assumed free and open market." *Epstein* v. *Boston Housing Authy.* 317 Mass. 297, 299–300. See Bonbright, Valuation of Property, 414–415.

In *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Authy.* 335 Mass. 189, we recognized (pp. 194–195) that for a special purpose property (developed for the particular needs of a nonprofit, charitable, or religious organization) there will generally not be an active market and that its fair value cannot readily "be shown by sales of nearby comparable property." We said that "to reach a just result when such a property is taken by eminent domain . . . much greater flexibility in the presentation of evidence" is essential than "in the case of properties having more conventional uses," and that, as to such properties, "the cost of land plus the reproduction cost (less depreciation where appropriate) of improvements may be more relevant than in the ordinary case."[5]

The same principles which are applicable to nonprofit agencies also apply, in general, to special purpose buildings owned by the State, public agencies, or public utilities, where the evidence warrants the conclusion that the real value of a property taken by eminent domain cannot be shown by a sequence of sales of similarly used properties,

---

[5] We also pointed out (p. 195), "Special opportunities for proof of value have long been afforded . . . where . . . there is no market value, in the sense in which . . . market value is reflected by a steady volume of sales [in the general real estate market] of ordinary . . . properties. . . . The courts in these cases . . . may be doing no more than recognizing that more complex and resourceful methods of ascertaining value must be used" in such cases and that "it is proper to determine [the hypothetical fair] market value from the intrinsic value of the property and from its value for the special purposes for which it is adapted and used."

by a capitalization of earnings, or by other usual criteria. See Nichols, Eminent Domain (Rev. 3d ed.) §§ 12.32, 15.1[1] et seq., 15.42–15.44; Orgel, Valuation under Eminent Domain (2d ed.) §§ 38–40. The principal usefulness of many properties owned by governmental bodies is to their respective owners for a particular purpose which is likely to be of interest to no other person. See Bonbright, Valuation of Property, 413–421, esp. at 416, 447–449.

2. The Authority's principal exceptions relate to the propriety of considering, as a guide to value, evidence of the 1962 reproduction cost of the armory building with adjustments to reflect depreciation and obsolescence. As we have already indicated, such evidence may be received (to be given appropriate weight with other evidence) with respect to takings of special purpose properties of public or nonprofit owners, where reproduction of essentially the same type of structure at the same site or elsewhere would be reasonable in the event of its destruction or taking. See Assessors of Quincy v. Boston Consol. Gas Co. 309 Mass. 60, 66; the Newton Girl Scout Council, Inc. case, 335 Mass. 189, 195.[6]

There is danger, of course, that evidence of reproduction cost (even if it purports to be fairly adjusted) may lead to "an excessive award unless it is [in fact] *adequately* discounted for obsolescence and inadequacy as well as for physical depreciation" (emphasis supplied). See Orgel, Valuation under Eminent Domain (2d ed.) § 199, and also §§ 188–198. In the Newton Girl Scout Council, Inc. case, 335 Mass. 189, the structures taken remained reasonably well adapted to the special purposes for which they were employed. They had not been shown to be in such condition as to make reproduction unlikely or imprudent. Ac-

---

[6] See also Gloucester Water Supply Co. v. Gloucester, 179 Mass. 365, 382–383; James Millar Co. v. Commonwealth, 251 Mass. 457, 464 (cost of reproducing filled land treated as admissible in the discretion of the trial judge); United States v. 84.4 Acres of Land, 348 F. 2d 117, 120–122 (3d Cir. — reproduction cost of golf course); annotation, 68 A. L. R. 2d 393. Cf. United States v. Certain Property, 306 F. 2d 439, 446–448 (2d Cir. — ordinary commercial building distinguished from special nonprofit use building). Cf. also Bachelder Truck Sales, Inc. v. Commonwealth, 350 Mass. 270, 273.

cordingly, adjusted reproduction cost figures could have been admitted in evidence because (a) the current cost of reproducing the buildings could be adjusted (fairly and without undue complication or conjecture) to reflect accrued physical depreciation and any functional or other obsolescence, and (b) the adjusted figure would reasonably tend to prove what the owner would have to pay to obtain approximately the same still desirable and useful structures, after taking into account age, wear and tear, and observed obsolescence.

A different situation exists, however, where special purpose structures are very greatly out of date, are no longer well fitted to their particular use, and would not be reproduced by any prudent owner. In such a case, evidence of adjusted reproduction cost will be irrelevant, for it is difficult, even for an expert, to estimate suitable allowances for physical depreciation and obsolescence of such an obsolete structure. See *United States* v. *Benning Housing Corp.* 276 F. 2d 248, 253 (5th Cir.) ; *Buena Vista Homes, Inc.* v. *United States,* 281 F. 2d 476, 477–478 (10th Cir.) ; *United States* v. *Certain Interests,* 296 F. 2d 264, 270 (4th Cir.). See also *United States* v. *Toronto, H. & B. Nav. Co.* 338 U. S. 396, 403; *United States* v. *25.4 Acres of Land,* 65 F. Supp. 333, 337 (E. D. N. Y.) ; *Salzberg* v. *State,* 24 App. Div. 2d (N. Y.) 664, 665 (no useful value left). See also Nichols, Eminent Domain (Rev. 3d ed.) §§ 15.43, 20.2. Cf. *Fairfield Gardens, Inc.* v. *United States,* 306 F. 2d 167, 173–174 (9th Cir.). The present record shows that evidence of the 1962 reproduction value of this obsolete armory had slight, if any, relevance in determining its value to the Commonwealth or to any other person. Even after a careful attempt to adjust the reproduction cost figures sufficiently for obsolescence, the result would be likely to confuse the jury. In the circumstances, admission of this evidence was prejudicial error.

3. Even when a structure taken by eminent domain, because obsolete at the time of the taking, would not be reproduced, it may still be useful and usable by its owner for

a substantial period after the taking for the special purposes for which it was originally built or acquired. The residual intrinsic value to the owner may still exceed what the land and structures will bring in the ordinary real estate market. The evidence in the present case would warrant the conclusion that this armory could have been used for from five to fifteen years after 1962. If the Commonwealth is not allowed to show in some reasonable way the detriment caused to it as owner (see *Davenport* v. *County of Franklin,* 277 Mass. 89, 93; Bonbright, op. cit. 419–421; see also Nichols, Eminent Domain [Rev. 3d ed.] § 12.32) by the loss of the armory's residual useful value, it will be deprived of just compensation.

If the armory had not been taken, the Commonwealth for a period of time could have postponed replacing the armory by a more modern structure. This (if done reasonably economically) clearly would have cost less than rebuilding the old armory. There was evidence of the cost of such an economical replacement (see fn. 4). The Commonwealth, by the taking, lost not only the value of its land but also the value to it of being able to postpone expenditure for a new structure. The value of that possibility of postponement (that is, the fair value of having available the old structure or a reasonable replacement structure during the useful life of the old armory remaining after 1962) is susceptible, we think, of measurement by some appropriate actuarial computation of the monetary loss to the Commonwealth caused by the destruction of its opportunity to postpone the expenditure (e.g. the present value of the interest upon the investment in, and the depreciation upon, a reasonable replacement structure during the remaining useful life of the old structure).

Any expert appraiser's opinion of the residual value of such a building will be expressed as an amount based on his judgment and experience, but he will naturally need to use (to assist him in his judgment) one or more reasonable methods of computing residual value or fair rental value of the same structure or a reasonable replacement of it for the

remaining life of the old structure. Such an expert may explain in his testimony, as part of his reasons, the considerations which in fact he has taken into account in reaching his opinion. See *Southwick* v. *Massachusetts Turnpike Authy.* 339 Mass. 666, 670–671. See also *Davenport* v. *Haskell*, 293 Mass. 454, 458–459; the *Newton Girl-Scout Council, Inc.* case, 335 Mass. 189, 199; *Fairfield Gardens, Inc.* v. *United States*, 306 F. 2d 167, 173–174 (9th Cir.). The cost of a suitable substitute structure may be taken into account appropriately by an expert appraiser in forming his judgment of the old structure's residual value. See, for discussion of replacement value, Orgel, op. cit. §§ 197–198; Bonbright, op. cit. 150–176, 184, 419–420; Barnsley, Equivalent Reinstatement as the Basis of Compensation for Compulsory Acquisition, 26 Conveyancer N. S. 425. He will, of course, be subject to proper testing of his reasoning on cross-examination. The jury should be cautioned, of course, that an expert's reasons and computations are not in themselves direct evidence of value but merely state the basis of his ultimate opinion. That opinion may be given weight to the extent to which the jury, under proper instructions, find it persuasive.

*Exceptions sustained.*

KIRK, J. (concurring in result) For the reasons stated by the majority I agree that the exceptions should be sustained. The cost in 1962 of reproducing a structure erected in 1889, which admittedly never would be reproduced, is obviously irrelevant and confusing as a factor in determining the damages sustained by the taking.

The majority suggest, however, that the cost of a suitable replacement structure may be considered by an expert in forming an opinion of the residual value of the old armory. This, it seems to me, would be equally irrelevant and confusing. The Commonwealth's evidence shows that a suitable replacement, which would necessarily require a different locus, would involve the construction of a modern school-type building with gymnasium, a parking area (for military and civilian vehicles), a helicopter landing area

and other features, none of which were present on the land taken. The dissimilarity is so gross as to make replacement cost patently absurd as a guide in reaching an opinion of the residual value of the old armory at the time of the taking. The replacement cost, like the reproduction cost, would result in a blizzard of figures irrelevant to the simple question to be resolved. The Commonwealth's evidence tends to show that the old armory, by obsolescence, had become so ill adapted to modern needs that its value as a special purpose structure had attenuated almost to the vanishing point.[1] This being so, I see no reason for applying any special rule for the determination of damages. Mathematical certainty is not always possible. We should require, however, the application of a sensible and understandable rule to enable the jury to reach a just result. The familiar and fundamental rule for the assessment of damages in eminent domain cases (the fair market value of the property taken, at the time of the taking) contemplates compensation to the owner for the residual useful value which the structure may contribute to the land, "taking into consideration all uses to which the land was adapted and might in reason be applied." Nichols, Eminent Domain (Rev. 3d ed.) § 12.2 (1). *Providence & Worcester R.R.* v. *Worcester,* 155 Mass. 35, 42. *Teele* v. *Boston,* 165 Mass. 88, 92. *Tigar* v. *Mystic River Bridge Authy.* 329 Mass. 514, 517. On the Commonwealth's evidence, it would seem that the application of the general rule would more nearly accomplish a just result than would an exceptional rule which would give free rein to the sometimes fanciful theories of experts.

Expert opinion testimony doubtless will be necessary to establish the fair market value of the property at the time of the taking. Although the admissible range of supporting data for the expert's opinion rests mainly in the discretion of the judge, it should not, I submit, extend to the estimated cost of a replacement structure.

---

[1] Statute 1962, c. 717, shows that the Commonwealth then contemplated the erection of a new armory by providing that the funds received from the Massachusetts Turnpike Authority be used, in addition to an amount already appropriated and to available Federal funds, for the acquisition of land and for the erection of a replacement armory with facilities.