**Paul G. Garrity**
**Justice of the Superior Court**

**GENERAL DYNAMICS CORP.,**
**Plaintiff**
**vs.**
**John P. COMER, et al., Defendants**

**No. 41421**

**Superior Court**
**Commonwealth of Massachusetts**

**March 4, 1982**

Lewis H. Weinstein, James K. Brown, Phillip Burling, Melvin R. Shuman, counsel for plaintiff.
Edward J. Lonergan, William B. Golden, counsel for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT
### I. GENERAL BACKGROUND

This action concerns various questions arising out of the assessment and collection of real estate taxes for the fiscal years 1977 through 1980 on 25 parcels of land in the City of Quincy ("the City"), collectively and colloquially known as the Quincy Shipyard ("the Shipyard"). (For convenience, the Court will treat the Shipyard as a single parcel, except where the context requires distinguishing one or more constituent parcels.)

Thoroughly prepared, imaginatively tried, and exhaustively briefed, the litigation raises three major issues:

A. Did plaintiff timely file its application for abatement of the fiscal year 1977 ("FY 1977") tax?

B. Were certain of the Shipyard's cranes properly treated as real property? (And, even if they were, did the 1977 and 1978 assessments lawfully include them?)

C. What was the fair cash value of the Shipyard on January 1, 1978 (the parties having stipulated that this value would apply to each of the challenged assessments)?

For convenience, this Memorandum will deal separately with each issue.

### II. THE 1977 ABATEMENT APPLICATION
#### A. Findings of Fact

On the basis of the parties' joint pre-trial stipulations of fact, I find:

1. On Friday, October 29, 1976, all the City's 23,000 real property tax bills for FY 1977 were stamped on the collector's postage meter, and mailed. The City's Treasurer-Collector personally supervised the mailing of those bills, and personally delivered them to the custody of postal officials in the Quincy Post Office.

2. The Treasurer-Collector has no independent recollection (1) that the mailing included the 25 tax bills pertaining to the Shipyard; or (2) that he mailed those bills.

3. On November 1, 1976, the Treasurer-Collector prepared and publicly posted in City Hall the following notice:

> This is to certify that the City of Quincy 1977 Fiscal Year Real Estate Tax Bills were mailed on or before November 1, 1976, and are due and payable on or before December 1, 1976.

A copy of the notice remained in the City Assessors' office.

4. When the Shipyard received FY 1977 bills, Frank Billota, Plaintiff's Chief of Financial Analysis, requested a meeting with Elmer Fagerlund, then-chairman of the City's Board of Assessors. At the meeting, which occurred in the second week of November 1976, Fagerlund told Billota that plaintiff would have to pay the bills; that plaintiff could challenge the taxes by filing an abatement application; and that abatement application forms were available in the City Clerk's office.

5. Plaintiff obtained about two dozen application forms, each of which had been pre-stamped by the Board of Assessors, "Due December 1st", so as to advise taxpayers the last date on which applications for abatement would be accepted.

6. In thus stamping the forms, Fagerlund, relying on the Treasurer-Collector's notice, had determined that the applications were due December 1.

7. No later than November 16, Billota had completed abatement applications covering the Shipyard.

8. In determining the deadline for filing the applications Billota relied on Fagerlund's statements during their mid-November meeting; he also relied on the language, "Due December 1st" stamped on the application forms.

9. On November 30, 1976, Billota filed the abatement applications and paid the FY 1977 taxes.

10. The assessors received 630 abatement applications concerning FY 1977 real estate taxes. Of these: 38 were filed in Quincy on November 29, 1976; 113 on November 30; and 83 on December 1.

11. The Board of Assessors has granted abatements (totalling $1.3 million in assessed value) as to 68 of the parcels concerned in the applications filed November 30 and December 1, the last such abatement having been granted November 16, 1978

12. Numerous taxpayers paid their respective taxes on November 30 or December 1, 1976; the city has not collected interest from, nor levied interest charges against, any of them.

13. The Treasurer-Collector received over 500 FY 1977 real estate tax bill payments on November 1, 1976.

### B. Conclusions of Law

1. Plaintiff, like any owner of real estate "upon whom a tax has been assessed", had the right "on or before the thirtieth day after the date on which the bill or notice was...sent" to apply for an abatement, G.L.c. 59, § 59.

2. Each tax bill was due and payable thirty days after mailing, G.L.c. 59, § 57. Any payment thereafter would be subject to a mandatory, non-waivable interest charge, ibid.

3. The Treasurer-Collector's testimony that the bills were mailed October 29, being the equivalent of an affidavit, is prima facie evidence that the bills were in fact mailed on that date, G.L.c. 60, § 3.

4. Certain evidence indicates, however, that the City's officials, for whatever reason, regarded the bills as having been mailed no earlier than November 1. The text of the certificate (Finding 3, supra); the stamp on the abatement application forms (Finding 5, supra); the granting of abatements as to applications filed more than 30 days after the purported date of mailing the notices (Findings 10 and 11, supra); and the failure to charge interest to those taxpayers who paid their taxes on November 30 or December 1 (Finding 12, supra), all combine to permit the inference, which I draw, that the Treasurer-Collector and the Board of Assessors believed that the bills had been mailed November 1. This evidence overcomes the statutory effect of the Treasurer-Collector's testimony, Singer Sewing Machine Company v. Assessors of Boston, 341 Mass. 513, 519 (1960).

5. All else apart, it would not be fair for the City, having twice represented in the most explicit manner that the tax bills had been mailed November 1, to penalize plaintiffs' reliance on those representations. Nothing in the controlling Massachusetts decisions suggests the inapplicability of this conclusion to the instant case.

6. It is true that estoppel ordinarily does not run against a municipality, Elbe File & Binder Co. v. Fall River, 329 Mass. 682, 686 (1953). Yet the principle is not inflexible; it probably does not apply if application would prejudice the taxpayer, Canron, Inc. v. Board of Assessors of Everett, 366 Mass. 634, 639 (1975). Although no trial judge should regard himself as an appellate court "writ small", C. Wyzanski, A Trial Judge's Freedom and Responsibility, 65 Harv. L. Rev. 1281, 1297 (1952), still, if, as here, the

controlling courts have not spoken, [1] the facts are compelling, and a fairly recent opinion clearly adumbrates the result, **Canron Inc. v. Board of Assessors of Everett, supra,** at 639, then a lower court can properly feel less restricted.

7. When a municipality misleads its citizens, it should not be permitted to profit from its wrong or its negligence, as against a party who, entitled to rely on the municipality's act, does so, thus changing his position to his detriment or prejudice, **Bender v. New York City Health & Hospital Corp.,** 38 N.Y.2d 662, 668 (1976). Even if holding the government to the consequences of its misconduct may adversely affect the highly-protected taxing power, **see, City of Boston v. DuWors,** 340 Mass. 402, 405 (1960), fairness demands that the loss fall on the party which invited it, **Pilgrim Turkey Packers v. Department of Revenue,** 261 Ore. 305, 310, 493 P.2d 1372, 1374 (1972). The ambiguities here would mislead a reasonable person; that suffices to estop the City from denying the timeliness of plaintiff's claim, **ibid.**

8. The justice of binding the City to the November 1 mailing emerges also from its course of conduct long after the posting of certification and the stamping of the application forms. By not seeking interest payments from taxpayers who did not remit until November 30 or December 1, even though the statute required such pursuit, without discretionary leniency, G.L.c. 59, § 57, the City as much as confessed that the mailing did not occur until November 1. And in accepting abatement applications which would have been untimely had the original bills been mailed before November 1, the city similarly conceded Plaintiff's present position. If, as the City contends here, the 30-day deadline is inflexible, how can it properly entertain those applications which its own authorities state to be worthless?

9. Plaintiff also urges the unconstitutionality of the City's considering abatement applications filed no earlier than plaintiffs. Because the present case seems so solidly to rest on non-constitutional grounds, wisdom suggests following the usual course, and leaving the constitutional issue (if one there be) undecided.

## III. THE CRANES
### A. Findings of Fact

1. The testimony, the exhibits, and (especially) the extensive view support a fundamental finding, viz., that at all pertinent times the Shipyard was an integrated industrial and business entity engaged in the production and repair of oceangoing vessels. (For convenience, all references to the Shipyard will use the present tense.)

2. At all pertinent times, the Shipyard was properly classified as a manufacturing corporation, see G.L.c. 63, § 42B; see also, G.L.c. 58, § 2.

3. The Shipyard is thus nothing more than a giant factory/repair shop. It employs massive machines to turn large pieces of steel into sizeable portions of ships; it uses out-scale equipment to assemble complete vessels from these ponderous components; and it utilizes the machines and the equipment to repair or refurbish existing ships.

4. Many of the devices and procedures have little or no direct application in any other industrial setting.

5. Particularized utility, or scale of equipment, or both taken together, do not alter the Shipyard's status. Whatever considerations may warrant treating the Shipyard distinctively for purposes of its overall valuation (see Part IV **infra**), it is, analytically, no different from a watchmaker's shop. The Shipyard's gigantic machines are merely tools used in manufacturing and repair.

---

1. The only cited authority, **Owens v. Assessors of Mashpee,** 1977 Mass. A.T.B. Sh. 62, an administrative decision, does not, in any event, sufficiently parallel the massive factual array of the instant case.

6. Although the Shipyard employs a variety of cranes—machinery designed to lift and transport heavy work-related loads—the present litigation concerns only 57 of them ("the cranes").

7. The cranes are all bridge cranes. A bridge crane is a raised beam from which a lifting device hangs over a work-space. The beam itself can move from one end of the work-space to the other; the lifting device can move along the beam (that is, across the work-space). Some of the cranes (ordinary bridge cranes) move along rails built into a building or structure. Others (gantry cranes) rest on legs which in turn can move on rails paralleling the work-space. Whatever the type, a bridge crane permits the operator to move a load from any point in the work-space to any other point.

8. One of the cranes at issue merits particular attention. Weighing 3700 tons and able to lift loads of 1200 tons, it is the largest gantry in the Western Hemisphere. So massive that one of its legs contains a full-scale passenger elevator, by which operating personnel reach the control room, it has been aptly named "Goliath". To accomodate Goliath's weight, the surface upon which its rails rest had to be specially reinforced; to accomodate its bulk, part of a nearby building had to be demolished.

**B. Conclusions of Law**

1. Whatever litmus may be proper when distinguishing realty from personalty for property-law purposes, the test here is neither removability, ponderosity, nor bulk.

2. For purposes of the applicable statute, G.L.c. 59, § 5, Sixteenth (3), the question is simply, "Is the item in question machinery reasonably related to and used in manufacturing operations?" **Board of Assessors of Swampscott v. Lynn Sand & Stone Co.,** 360 Mass. 595, 597-599 (1971).

3. "Machinery", for purposes of the statute, is "a mechanical device which can fairly be said to be a machine," **Assessors of Haverhill, v. J.J. Newberry C.,** 330 Mass. 469, 472 (1953); see also, **Assessors of Brockton v. Brockton Olym-**pia **Realty Co.,** 322 Mass. 351, 355 (1948).

4. Having found, as a matter of **fact,** that the cranes (including Goliath), are tools, albeit gigantic ones, employed in the Shipyard's business, I must therefore conclude, as a matter of law, that they are machinery exempted from local taxation.

## IV. THE SHIPYARD'S FAIR CASH VALUE AS OF JANUARY 1, 1978
### A. Findings of Fact
(All refer to January 1, 1978).

[In reaching these findings, I have had the benefit of testimony (oral and written) from experts in assorted fields: technology of modern shipbuilding/ship repair; economics of shipbuilding/ship repair; valuation of real estate; valuation of structures used in shipbuilding/ship repair; market economics; and valuation of shipbuilding/ship repair enterprises. I also had before me, in the form of Annual Reports and similar items (Ex. 5-13), statements by plaintiff, which I considered to be admissible as admissions, see, P. Liacos, **Handbook of Massachusetts Evidence,** 275-276 (5th ed. 1981). The findings rest on that part of the testimony and the admissions which I found credible (and on the reasonable inferences which I drew therefrom). To the extent that any finding differs from contrary evidence, the finding equates with a determination that the particular evidence was either not credible, or was less credible than the evidentiary-inferential combination supporting the finding.]

1. The highest and best use of the Shipyard's real estate is as a shipyard, that is, a business entity engaged in the fabrication and repair of ships.

2. The Shipyard comprises 5,705,717 square feet of land located in Quincy, and 2,115,278 square feet of land located in Braintree. The Braintree-Quincy line runs through the Shipyard, so that 72.95 percent of the Shipyard's land area is located in Quincy, and 27.05 percent in Braintree.

3. The Shipyard is an integrated industrial and business entity; every portion of its land area, wherever located,

contributes to the enterprise.

4. A willing purchaser possessing limitless funds, seeking to purchase the Shipyard realty from a willing seller (neither of them under any economic or other compulsion to conclude the transaction) would, when calculating the price he ought to pay, consider certain facts, which, of course, the seller would likewise have to consider when determining the figure **he** would accept.

5. Although anyone contemplating buying the Shipyard real estate would first of all consider the value of the Shipyard as a business entity, he would not price the real estate thus. That is, he would not equate the value of the Shipyard's real estate with the Shipyard's "going-concern" value (its value as a business). He would, however, take that value into account when assaying the desirability of purchasing real estate useable as a Shipyard. Put another way, because the highest and best use of the realty is as a shipyard, a reasonable purchaser would wish to know what the future could reasonably be expected to hold for a shipyard business conducted on the site.

6. A reasonable purchaser would invest in the Shipyard real estate only after considering the business prospects for a shipbuilding and repairing enterprise conducted there. No such purchaser would make any offer for the real estate which did not appropriately reflect the commercial probabilities. Anyone contemplating purchase of real estate whose highest and best use was as a shipyard would consider the earnings which that use could be anticipated to generate. See **infra,** Finding 25.

7. Such a purchaser would encounter considerable difficulty determining the value of the improved real estate, that is, the land **and** the buildings.

8. Normally, one calculates the fair market value of a building in one of four ways, see, **Correia v. New Bedford Redevelopment Authority,** 375 Mass. 360, 362 (1978): (a) depreciated replacement cost; (b) depreciated reproduction cost; (c) capitalization of income (based on an estimated rental value); or (d) comparison with sales of similar realty.

9. The **replacement cost method** estimates the cost of constructing a building equivalent in utility to the building in question, but constructed according to present-day (**i.e.,** January 1, 1978) standards, design, and layout, with present-day materials, at present-day prices. This "new" value is then reduced by an amount representing depreciation.

10. "Depreciation", as the term is used in connection with either of the cost methods of valuation, means simply the degree (measured in dollars) to which time has lessened the structure's original value. Depreciation includes physical deterioration, functional obsolescence (as, for example, antiquated design), and economic obsolescence (as, for example, a permanent change in the business climate). Thus every structure suffers wear and tear over the years; a building erected in 1900 might be considered functionally obsolete because it lacked efficient central heating or air conditioning; a building orginally designed and used for the manufacture of San Francisco cable cars might be considered economically obsolete.

11. Of course, no form of depreciation deprives a building of value entirely. The concept of depreciation - whatever its form - does, however, reflect the economic fact that without some degree of structural repair or modification, a building which has adversely changed, either physically, functionally, or economically, is worth less than its optimum value.

12. The **reproduction cost method** estimates the cost, **less** depreciation, of exactly duplicating the building, at present-day (**i.e.,** January 1, 1978) prices, using the original materials, standards, design, layout, and quality of workmanship.

13. Thus the replacement cost method conceives a building as useful as the present structure, and functionally equivalent to it. The reproduction cost method conceives the present structure's

exact physical duplicate.

14. The **capitalization-of-income method** requires ascertaining the rental **income** which the builder either actually brings or (if, as here, the property is owner-occupied) would bring, if rented out. In the latter case, evidence of the rental income of realty comparable to the particular premises can establish the rental **value**—or constructive rent—of the premises at issue. Having obtained a dollar figure for the rental **income** or **value** (each typically expressed in annual terms), one derives the market, or sale, value of the premises by deducting from the rental income or value an appropriate expense figure, thus producing a net annual rental income or value. One then multiplies this by an appropriate **earnings multiplier;** the product is the capitalized market value. The earnings multiplier is nothing more than the reciprocal of the percentage return, sometimes called the capitalization rate, which a contemporary investor would expect from similar rental property. Thus if persons investing in real estate comparable to the subject premises would expect the property to produce net annual rent equal to, say, 5% of the property's sale value, the earnings multiplier would be 20. That is, one would multiply the total net annual rent by 20 to calculate the property's sale value. If the expected return on comparable property were 6%, the earnings multiplier would be 16.6667; if the anticipated return were 8%, the multiplier would be 12.5; and so on.

15. The **comparable-sales method** (somethimes known as the **market-study method**) requires evidence of the sale price of one or more pieces of realty comparable to the subject premises. Although any parcel of land is unique, the law recognizes that a prospective purchaser would probably take a commonsense pragmatic view, **viz.,** that the selling price of comparable realty is an excellent index of any property's value.

16. On the basis of the evidence introduced at the trial, whether oral or written, I find that none of these valuation methods alone—however useful any or all of them might be in valuing other realty—is appropriate for deriving the fair market value of the Shipyard. That is, no purchaser of the Shipyard realty would use any of these methods alone to establish the price he ought to pay. The physical state of the Shipyard is such that he would not consider useful any calculus of cost to replace or reproduce any building; nor would he regard as feasible any calculation of the buildings' respective rental values. He would not use the comparable-sales method because he would be interested only in the value of the realty **qua** shipyard, and no comparable sales of a shipyard are available to consider.

17. I find, however, that the hypothetical purchaser might well utilize one or more variants of these methods. Thus, as will become apparent, I have, when determining the proper valuation figure, relied on some of the techniques which these methods teach.

18. I find that each of the "normal" valuation methods is inapplicable to the Shipyard because the Shipyard is a property of such unusual and specialized character that none of the methods would fairly establish its value. In doing so, I have in mind that the theoretical purchaser is likely to be a corporation similar to plaintiff, and that the number of such buyers would be small, see, **Boston Gas Co. v. Assessors of Boston,** 334 Mass. 549, 572, 584 (1956), and that, as I have earlier indicated, a purchaser would only consider the realty's value as a shipyard.

19. The basic flaw common to each of the "normal" methods is its focus on the individual building (including the land on which it stands), rather than on the premises' symbiotic relation to all the other Shipyard realty. Put another way, none of the "normal" methods sufficiently recognizes that it is the **Shipyard** which the City seeks to value, not the individual parcels. Because, as the parties have properly stipulated, the highest and best use of the entire land area is as a shipyard, one must evaluate every building only in that context. I do not accept as credible,

testimony suggesting the possibility of valuing the Shipyard by considering the hypothetical rent derivable from a hypothetical lease of the entire Shipyard.

20. Bearing in mind that the ascertaining of fair market value always rest on hypothesis, **Commonwealth v. Massachusetts Turnpike Authority,** 352 Mass. 143, 147 (1967), and that it must therefore inevitably lack mathematical certainty, while partaking largely of opinion, estimate, and judgment, **Assessors of Quincy v. Boston Consolidated Gas Co.,** 309 Mass. 60, 72 (1941), I find as a fact that the hypothetical seller and purchaser would adopt the following evaluative method, which I further find to be the most credible way of determining the Shipyard's fair market value. (Of course, this is not to suggest that the seller and purchaser would derive identical figures; it merely means that each would utilize this method in ascertaining his or its negotiating "ballpark").

21. The evaluation method consists of these steps:

**First,** ascertain the value of the business conducted on the entire Shipyard (Braintree and Quincy portions).

**Second,** pursuant to the principle that income from a business conducted **upon** land depends on non-land factors, and therefore does not determine the value of the land, **Amory v. Commonwealth,** 321 Mass. 240, 258 (1947), calculate and subtract the value of the so-called "intangibles", **i.e.,** the elements that prescind from the physical assets and go to establish the Shipyard's market value as a business entity.

**Third,** subtract the value of (a) the cranes (which in Part III of this Memorandum, I have found to be exempt from taxation as realty) and (b) other non-taxable equipment (located in Quincy and Braintree).

**Fourth,** multiply the resultant by a decimal equivalent to the proportion which the Quincy-sited part of the Shipyard bears to the entire Shipyard area.

22. The end product is a figure which represents the amount that a willing purchaser would pay a willing seller (each without compulsion to do business) for the taxable real estate assets located in Quincy.

23. The parties introduced considerable testimony pertinent to the economic outlook for a shipbuilding/ship repair business conducted on the Shipyard site. Understandably, plaintiff took the position, always uncomfortable for a business-seeking entrepreneur in a competitive industry, that the Shipyard lacked the layout, location, equipment, and productivity to class it with its natural competitors. The City's expert, on the other hand, regarded the Shipyard as "one of the most modern and versatile facilities in the United States....[A] very viable and competitive facility," of economic obsolescence "so minimal as not to be quantifiable" (Ex. 18, pp. 22-23).

24. Although the outlook (as of January 1, 1978) may not have shone so brightly as the City contends, certainly it was nowhere near so bleak as Plaintiff would have the Court believe. Besides the crediting of the City's evidence inherent in the preceding sentence, I have in mind plaintiff's own contemporaneous expressions of self-confidence and technological competence, **General Dynamics Annual Report, 1977** (Ex. 6); **High Technology Shipbuilding** (Ex. 9); **Shipbuilding by General Dynamics** (Ex. 10); P.T. Veliotis, **Series Production of Liquified Natural Gas Carriers** (Ex. 12); and **LNG Ships by General Dynamics** (Ex. 13).

25. Bearing in mind that a prospective purchaser of the Shipyard's realty would consider the investment only if he could profitably operate a shipbuilding/ship repair business on the premises, it is apparent that such a purchaser would first consider a reasonable projection of the business' earnings for several years after the pertinent date (January 1, 1978). He would average out all these figures to produce an "annual" earning figure, or, more accurately a reasonable prediction

of subsequent earnings.

26. Figures presented by Plaintiff show projected earnings for the period 1978-1982 averaging $13,581,000 annually (Ex. 4, App. K-1). I find that figure reasonable, and consistent with plaintiff's own view of the Shipyard's prospects, see Ex. 6 (**General Dynamics Annual** Report, 1977) p. 2 ("[I]t is apparent that with the orders presently on the books, the LNG ship program will be profitable"); p. 4 ("We have taken decisive steps to reduce the drain on our cash flow from our Navy ship building activities and to strengthen our management organization"); p. 2 ("We are confident that Quincy has established a successful long-term product line with its LNG tankers").

27. To derive value for the business entity which generated these earnings, one must ascertain first the percentage of investment return (**i.e.,** the ratio which the earnings bear to the value of the organization producing them). Like the concept employed when valuing property by the capitalization-of-income method, this procedure requires determining the rate of return which the capital market (**i.e..** the industry's community of prospective and actual investors) expects from capital invested in shipbuilding/ship repair enterprises.

28. This number, usually called the capitalization rate, numerically expresses the market's assessment of an amalgam comprising: (a) the risk involved in any particular investment; (b) the growth prospect (including the effects of inflation which the investment offers; and (c) the discounted value of future (as opposed to present) monetary returns. Put another way, the capitalization rate registers the market's fears and hopes as to the industry generally. Faced with an opportunity to purchase an entire business annually earning $13,581,000, an investor would expect to pay no more than an amount which, multiplied by the capitalization rate, produces $13,581,000. Were he to pay more than that amount, his investment would be earning less than what the industry, generally, produces for its investors. Individual circumstances may, of course, warrant paying more (or less); but the industry-wide capitalization rate (and its numerical reciprocal, the price-earnings ratio) determine the yardstick price. (In practice, of course, one usually calculates the value through multiplying the annual earnings by the price-earnings ratio).

29. It is obvious that determination of a capitalization rate and price-earnings ratio, either industry-wide, or for a single business, is not susceptible of mathematical precision. Selection of any given number, no matter how carefully based on comparison with other firms, application of sophisticated mathematical theorems and equations, and analysis of industrial potential, all reduces to hypothesis. Having considered all the evidence, I find that the most appropriate and fair capitalization rate applicable to the Shipyard is 16.94915% (and the price-earnings ratio, 5.9). In so finding, I have in mind that the price-earnings ratio of a comparable shipbuilding/ship repair firm, American Shipbuilding Company, was 5.9 in 1977.

30. It now becomes possible to calculate the value of the entire Shipyard business as the product of the annual earnings and the price-earnings ratio: $13,581,000 **times** 5.9 **equals** $80,127,900.

31. To extract from this figure the value of the taxable realty in Quincy, it is necessary to deduct the value of the so-called "intangibles", the value of the cranes, the value of the other equipment, and the value of the Braintree real estate. (It is not necessary to consider the value of plaintiff's facility at Charleston, S.C., which manufactures certain components of LNG tankers. I credit evidence that the Charleston facility operates as a separate economic entity, and I draw the inference that for present purposes one may consider the Charleston plant as merely another outside supplier.)

32. The "intangibles" are those factors of a business' value other than land, plant, and equipment. The intangible assets include working capital, going-concern value, and condition of the work

force. One witness testified that the Shipyard's intangibles totalled 50% of its value; another set the figure at 80%. I find neither figure credible. I credit the testimony that no conventional wisdom exists for making this type of necessarily judgmental allocation. Although I recognize the dollar significance of a trained workforce and managerial expertise, I have in mind the Shipyard's physical capabilities, its location, and its mechanical ability to perform its business—all prominently and properly the subject of plaintiff's expressed pride. For example, plaintiff's pamphlet, **High Technology Shipbuilding** (Ex. 9), notes that plaintiff "has pioneered the extensive use of computers and automation in American shipbuilding. Computerized systems are employed in all major functions at Quincy. ...Among the modern facilities at Quincy are three major assembly basins...and two large construction basins served by a 1200-ton Goliath crane... The shipyard has a complete line of heavy and light fabrication equipment that produces standard and custom parts, a highly sophisticated pipe fabrication shop, a versatile machine shop, and specialized sheet metal capacity." The pamphlet includes numerous photographs of various items of equipment, which supplemented the Court's own recollections of observations at the view.

33. Plaintiff's pamphlet, **Series Production of Liquefied Natural Gas Carriers** (Ex. 12), written by one of its vice-presidents, glowingly describes and depicts plaintiff's "innovative LNG ship series production plan" and "successful transformation from a conventional, labor-intensive shipyard to a mechanized, highly productive facility capable of cost-effective series production of large, technologically complex LNG carrier and containment systems."

34. Plaintiff's pamphlet, **Shipbuilding by General Dynamics** (Ex. 10), although arguing that "Quincy's greatest asset is its skilled and versatile labor force," devotes most of its pages to verbal and pictorial praise of "the most modern and pro-

ductive equipment and processes for building large and sophisticated vessels of every variety." It also boasts of "[a]n automated structural parts and panel assembly process, advanced blast and painting techniques, 200-ton unit transporters, and modern up-to-date support facilities."

35. Finally, plaintiff's pamphlet, **LNG Ships by General Dynamics** (Ex. 13) proclaims: "In developing our capability to construct LNG ships, we have made considerable capital commitments...investing more that $60 million in a massive expansion and modernization of our shipyard at Quincy."

36. I find that the "intangibles" merit a discount of 40%.

37. I accept as credible and appropriate for present purposes a valuation of the bridge cranes based on a consideration of their cost, age, physical condition, and obsolescence, and of Goliath based on a consideration of its cost, age, physical condition, location, and degree of utilization, including in each instance a 36% downward adjustment of the replacement-cost-new-less-depreciation (Ex. 15, pp. 58-61). (Other evidence as to valuation of these items was adduced, but I do not credit it.) Applying this calculus, I find the value of the inside cranes to be $1,017,435; the outside cranes, $404,127; and Goliath, $6,381,094. Total: $7,802,656.

38. The Shipyard's Quincy equipment (other than the disputed cranes) and all the equipment located in Braintree total in value $12,821,046, calculated, according to evidence which I credit (Ex. 15, App. S-6), by subtracting accumulated depreciation from original cost. This is not to say that this method is the only appropriate means of valuing this congeries of items; but it is a method, and I accept it as credible and appropriate for present purposes.

39. The Braintree realty occupies 27.05% of the Shipyard's total land area. However, the Shipyard opeates as a unit, and any evaluation of the entire real estate value must take that fact into account. Accordingly, the most ap-

propriate calculation of the Braintree exclusion requires multiplying the value of the total real estate by the Quincy percentage (i.e., 72.95%).

40. The foregoing findings, arithmetically applied, produce the following results:

| | |
|---|---|
| Projected annual earnings, 1978-1982 (average) | $13,581,000 |
| **Times** Price-earnings Ratio | 5.9 |
| Overall value | $80,127,900 |
| **Times** (1 minus the .4 "intangibles" factor) | .6 |
| Value of land, plant, and equipment | $48,076,740 |
| **Less** value of disputed cranes; $7,802,656 | |
| **Less** other Quincy equipment and Braintree equipment $12,821,046 | |
| | $20,623,702 |
| Value of land, buildings, and other taxable property[2] | $27,453,038 |
| **Times** Quincy fraction of Shipyard area | .7295 |
| Value of Quincy land, buildings, and other taxable property[3] | $20,926,991 |

41. The value of the conduits, pipes, wires, and poles referred to in Footnote 2, **supra** ("the taxable personal property") is $160,000.

42. The value of the Quincy fraction of the taxable personal property is $160,000 **times** .7295 **equals** $116,720.

### B. Conclusions of Law

1. The fair market value of plaintiff's land, buildings, and other taxable realty in Quincy, as of January 1, 1978, was $20,810,271.

2. The parties having stipulated that the assessed value of such property on that date was 25% of fair market value, the realty at issue here should have been assessed at $5,202,568.

3. The fair market value of the taxable personal property in Quincy as of January 1, 1978, was $116,720.

4. The parties having stipulated that the assessed value of such property on that date was 25% of fair market value, the taxable personal property at issue here should have been assessed at $29,180.

### ORDER FOR JUDGMENT

The parties shall, within 30 days of this date, submit proposed forms of final judgment, consistent with the Findings of Fact and Conclusions of Law stated herein. Supporting memoranda are not required. The parties may, by stipulation in writing, submitted to the Court, extend the filing deadline.

**Hiller B. Zobel**
**Justice of the Superior Court**
Dated: March 4, 1982

---

2. "Other taxable property" describes certain conduits, pipes, wires, and poles.
3. It is not necessary to state separate values for the various categories of realty which this item comprises.